GRACE NYSWANDER, Administratrix, Appellant, v. FRANK GONSER, Appellee.

No. 42149.

·APRIL 3, 1934.

E. G. Dunn and M. H. Wiegman, for appellant.

Senneff, Bliss & Senneff, for appellee.

ALBERT, J.—At about 5:30 o'clock in the evening, on the 4th day of December, 1932, plaintiff's deceased, Blanche Madison, was struck and killed by the defendant's automobile, on arterial highway No. 106, which extends from Mason City to Clear Lake. At the point in question the said highway was not within the limits of any city or town.

The first error assigned arises from a tender of evidence made by the plaintiff by a witness seeking to show what the usual

custom of the deceased was in approaching said crossing. This error is bottomed for authority on decisions of other jurisdictions. However, this court, in the case of Darden v. C. & N. W. Ry. Co., 213 Iowa 583, loc. cit. 587, 239 N. W. 531, is decisive on this question against the plaintiff. The record shows that there was an eyewitness, aside from the defendant and the occupants of his car, who saw and described this accident. The eyewitness rule, therefore, does not apply, and the holding of the Darden case is that the uniform holdings of this court and other courts is such that the offered testimony in regard to the prior conduct of the engineer was not admissible (citing authorities). We think, therefore, that the ruling of the court in excluding this testimony was right.

Plaintiff also invokes the doctrine of the last clear chance. Under the record as made we find that this is not a case where such doctrine would apply, and further than this, we have settled the proposition in the case of Steele v. Brada, 213 Iowa 708, 239 N. W. 538, that such doctrine is not available unless the same is pleaded. We said in that case:

"Appellee's petition in the case at bar nowhere contains allegations sufficient to present this doctrine."

As further sustaining our conclusion, see Phelan v. Foutz, 200 Iowa 267, 204 N. W. 240.

Further error is assigned on the proposition that at the time the court directed a verdict for the defendant there were only eleven members of the jury present, and hence the plaintiff insists that her motion for a mistrial should have been sustained. With this, we cannot agree. The court in effect decided that the deceased was guilty of contributory negligence as a matter of law, hence holding that the plaintiff had not made out a case for the jury, and it would seem to be wholly immaterial whether there were eleven jurors or twelve present at the time. The signing of the verdict by the foreman under the direction of the court was a mere formality, and we think the court did not err in overruling the plaintiff's motion for a mistrial and discharge of the jury.

In the case of Marion v. Home Mutual Ins. Assn., 205 Iowa 1300, loc. cit. 1303, 217 N. W. 803, 805, we said:

"On the other hand, if a plaintiff rests without introducing any evidence which entitles him to go to the jury, and a motion to di-

rect a verdict is presented, argued, and submitted to the court, and decision thereon is announced and entered upon the docket, we see no fair reason for saying that the case was not fully submitted. There was nothing left for the consideration of the court. There was nothing presented which could be considered by the jury. The signing of a verdict under direction of the court is a mere formality, and may be followed or omitted with equal legality. A motion to direct a verdict is the equivalent of a motion to withdraw a case from the consideration of the jury and to dismiss the same. To submit a directed verdict to the jury is a formality which has no other function than to give form to the record."

See, also, 64 C. J. p. 503, section 454.

Further than this, this alleged error relied on for reversal was not argued in appellant's argument in chief, and under subdivision 7 of Rule 30, the same is deemed to have been waived.

The dominating question in this case is whether or not the court erred in directing a verdict for the defendant.

The evidence in the case shows, giving the plaintiff the full benefit of all the testimony, that this accident occurred at the inter-section of the aforesaid paved arterial highway No. 106, which runs approximately east and west, and another highway which crosses the same at approximately right angles; the latter road being a graveled highway. Paralleling said highway No. 106, and a short distance north thereof, was a track of the Mason City & Clear Lake Railway Company. A few feet north of that and paralleling the same was a sidewalk which ended at approximately the west line of the north and south highway.

Blanche Madison lived a block west and a part of a block north from the scene of the accident. Her route in traveling to the place of the accident was, leaving her home, she traveled south to the corner of the block and east on the sidewalk above designated, ap-parently to its end; then she turned south and crossed the railway track onto the pavement. She was struck south of the center line of the pavement, by a car owned and driven by the defendant, com-ing from the east, which resulted in the injuries from which she shortly afterward died.

There is no dispute in the evidence on the question of where she was struck by the automobile. The only eyewitness, aside from the defendant and the occupants of his car, is one Woltenhauer,

who testifies that he lived half a block south of the paved highway and on the west side of the graveled highway. At the time in question he started from the place where he resided and traveled in a northerly direction toward the intersection. As he approached said pavement he saw the two headlights of the car coming from the east, and saw Mrs. Madison right in front of the right headlight.

"She was just about right in front of the headlights,—not quite. I saw her struck. It seems to me she was on the south side of the black mark dividing the middle of the pavement. She was facing south coming south across the pavement and she would be about the west side of the traveled part of the intersection—along the west edge as near as I can judge. The car swerved and threw its lights up toward the store (the store is south of the pavement and west of the graveled highway) and then it went in a southwesterly direction after it hit her. The body was lying about four or five feet I would judge off from the south edge of the paving, and about 65 feet west from the point where she was hit. I didn't have time to observe whether she was walking or standing still."

On cross-examination this witness says:

"I think the car was going about 40 or 45 miles. I heard the brakes on the Gonser car. I think Gonser was going about 40 at the time he struck Mrs. Madison."

This witness had previously made a written statement to the attorneys for the defendant, in which he said:

"I saw the Gonser car coming from the east when it was about 50 or 75 feet east of the intersection. His headlights were on. I saw him turn toward the store and he apparently tried to avoid Mrs. Madison. I saw her immediately in front of the headlights and she appeared to be trying to beat Gonser across. When I first saw him he was going about 40 miles an hour and when he struck her he was going about 25 miles an hour. From what I could see it didn't appear to me that Gonser could avoid hitting Mrs. Madison."

A witness for the plaintiff further testified that the next day after the accident Gonser and his wife came to the residence of the deceased, and in the conversation there he said that:

"When he saw this woman she appeared to be in the middle of the street and his car was right on to her and he said, 'I aimed to

do the right thing. I guess I did just the wrong thing by turning out on the south side.' "

Another witness testified that Gonser said:

"He stated that he didn't see the lady until he came up on her about the middle of the paving and then he said something—I can't word it just as he said it—about he said he thought he was doing the right thing but he guessed he did the wrong thing."

Another witness for the plaintiff testified that he did not see the accident, he was in the store building southwest of the intersection, and that he and Gonser and Cress went out to look at the pavement. He further says:

"I noticed on the paving that the car had left a mark as though the wheels were set approximately 25 feet east of the intersection and in the middle of the paving. This is where the wheels of the Gonser car started to skid and crossed the paving there to the south side of the middle line. The wheel tracks of the Gonser car left the paving on the south side at the west line of the intersection somewhere around the edge of the west side of the intersection. I would say that the distance from the point where the car crossed the center line east of the intersection to the point where the car stopped is a distance from 100 to 125 feet. The tracks led from the back of the car where it stopped to a point east of the intersection where they crossed to the south side of the black line east of the intersection."

Another witness testified for the plaintiff:

"Gonser said he was right on the lady before he saw her, and he turned out to the left to go around her. Thought he was doing the right thing, but instead of that he did the wrong thing."

Another witness testified:

"I heard Mr. Gonser say he was going at a terrific speed when he hit the lady. I didn't hear him say anything about where he saw her, or when."

Another witness testifies that a car traveling at 45 miles an hour could be stopped in less than 75 feet, but the people riding in the car might be thrown against the windshield.

"I heard Mr. Gonser say that he seen her approaching the pavement as he crossed the intersection by Glanvilles and he said he tried to swerve and miss her. He said he was sure he wasn't going over 45 miles an hour."

Another witness testifies:

"I thought Mr. Gonser remarked that he was going just a little bit too fast, in the store."

Cress (the sheriff) testifies that he went to the scene of the accident and Gonser stated that he was traveling about his average gait or speed.

"I asked him what that was and he said about 40 miles an hour. We went out and looked on the pavement and he showed me just about the spot when he first saw this lady and I sized up the distance as being probably 35 feet. Then we traced the car tracks from the time that he first saw the woman or said he did to where the car was stopped and about just where the impact of the two, the car and the lady, met—just about where that was and where the car was. The point where he first saw her was west of the intersection, I would imagine about 20 or 25 feet. The car tracks began to cross the center line about 10 feet west of that spot. In the conversation then with Gonser, as I recall he stated that the woman started across and he thought that he could miss her—he stated that if he went straight ahead he would strike her and he went to the left; he said he pulled to the left. I think that is all that was said just about that phase of the accident. Gonser said he thought he would have a better chance of missing her by pulling out to the left after he saw her leave the edge of the paving and start across. I would say that the bumper of the car had apparently not been injured in any way or struck. The view east of a person standing on the north side of the intersection, in my judgment, would be unobstructed between a quarter and a half mile looking east."

This is the substance of the plaintiff's testimony, and upon plaintiff's resting, a motion for a directed verdict was made and overruled.

Several plats and photographs were introduced in the case as evidence showing the territory at and adjacent to the point where this accident occurred, and also pictures of the car after the accident.

The defendant Frank Gonser testified that he was driving about 40 to 45 miles an hour as he approached the intersection.

"As I approached this crossing I took my foot off the accelerator and as I got past the Glanville cottage I noticed this woman come up and hesitate at the next intersection (where the accident occurred), somewhere along in there. She was about halfway between the street car tracks and the north edge of the paving when I first saw her. She came to the edge of the paving, hesitated, and started forward, and as she did I honked my horn and turned to the center of the paving and she slowed up, looked my way, and then tore into a run and as she tore into a run I threw all my brakes on that I had and turned to the left to miss her, and somewhere possibly halfway between the black line and the south edge of the paving, still in that intersection, she ran into my car on the righthand side, pretty well to the front of the right fender. There were no dents in the car before the collision. There is a dent in the right fender just above the hub in the right wheel which was not there before. There was a dent in the hood near the cowl, along the side. There was a dent on the inner side of the right front fender which was not there before. When Mrs. Madison was thrown up onto the car her head struck in the dent in the hood, her body was extending to the front of the car. After she struck there I went about 30 or 40 feet. The car came to a stop and she rolled off and rolled over once or twice and laid on her right side facing the north. The bumper was all right, there were no fresh marks or anything on it. My lights were all right. They would show 100 feet ahead. They ought to have been seen for two miles. My brakes were good. After the car came to a stop I immediately got out on the lefthand side of the car and ran around the car, my wife had already got out of the car on the righthand side and she had turned the body over and raised her head off of the ground when I got there. I pulled a blanket out of the car and threw over this lady, and then went back and threw over another one. I asked the grocery man to call the sheriff and the ambulance, which came before the sheriff came. The car tracks began about 30 to 35 feet east of the intersection, about 20 feet east of the east side of the intersection. I was 40 feet from Mrs. Madison when she stepped on to the paving. She was on the westerly side of the road that came down to the paving, the intersection cross road, the westerly side of the graveled part. I would judge the graveled portion is about 15

feet wide. I think I was going about 40 miles an hour when she came on to the paving. When she came on to the paving I honked my horn. She came down and stopped, and then she started to cross, she hesitated again before she got to the center line. She looked my way. It is my judgment that I couldn't have been going over 20 to 25 miles an hour when I struck her. I made no remarks about going terribly fast or at a terrific pace or too fast. I told the sheriff all I knew about it. My wife and I went to the hospital where Mrs. Madison was taken, but when we reached it she had passed away."

On cross-examination he said:

"It was quite dark when I passed the Glanville home. I saw Mrs. Madison when I was probably 300 feet past the Glanville home, which is on the west side of the first crossing. Mrs. Madison was about halfway between the paving and the railway track when I first saw her. The distance between the north edge of the pavement and the railway track is about 30 feet. She was probably 10 or 15 feet north of the north line of the paving. I would judge I was about 100 feet from the intersection when I first saw her. I would judge Mrs. Madison was about halfway between the black line and the south line when she ran into my car. The pavement is 18 feet wide. Mrs. Madison hesitated while she was north of the center line of the paving. She started and ran into my right front fender. The right front light on my car was broken from the top. The right front fender was bent back. The front end of my car was from 100 to 125 feet from her when I first saw her. I slowed down for this crossing to about 40 miles. I was watching her. She had stopped at the paving, she started on a run across the paving, she hesitated when she got about, pretty near the black line, and then started in on this terrible run, just as hard as she could tear just about the time she got to the black line. After I had turned my car and thrown on my brakes I realized what she was trying to do. That is why I turned to the left. I had no time to turn to the right. When I saw her begin to run the front end of my car was about 30 to 35 feet from her. I turned my car to the left before she was going across from the right side to the left side. I turned from the right side to the left to give them a little more room, if they would—you would expect a lady to stop at the intersection here, not knowing what people do you naturally pull to the opposite side of the paving. I was about 25 or 30 feet from her when I put my brakes down so

that the car stopped. Some 100 feet east I saw her about halfway down from the tracks and she came down and came close to the edge of the paving and came to a stop and she looked toward me and then she started across. Then she looked at me just north of the center line and she hesitated at that point and then she tore into this run."

The wife of the defendant testifies:

"I first saw Mrs. Madison as she was standing just off the north edge of the paving. She was looking eastward toward us. I do not remember how far we were from her. After I saw her standing there she started on to the paving, sort of a trot, and before she started on to the pavement Mr. Gonser had pulled a little to the left. As she started on to the pavement Mr. Gonser sounded his horn and swerved further to the left and just before or about that time she reached the black line, she stopped again and looked toward us, and then started to run very rapidly on across the paving to the south. I saw her when she and the car came together somewhere probably halfway between the black line and the south edge of the pavement. She ran into the side of the front fender on the right side of the car and was thrown up so that she alighted on the hood of the car with her head toward the cowl. Her limbs were down toward the radiator of the car. I noticed the front bumper of the car the next morning. It did not show any marks of an impact. There was dust, a film on the bumper of the car, both sides looked exactly alike. There was none removed from the right side. I was looking right at Mrs. Madison and I know where she struck the car."

This is the substance of the testimony in this case. At the close of all the evidence the court sustained a motion to direct a verdict in favor of the defendant, and held, among other grounds of the motion, that the deceased had not shown herself free from contributory negligence. We are disposed to agree with the district court in its ruling, in that we conclude that the plaintiff failed to sustain the burden of proving deceased free from contributory negligence.

These death cases are always regrettable and arouse our sympathy, but the rules governing these matters are so well fixed in the opinions of this court that, as we have no inclination to change them, the only thing that we can do to follow these rules is to say that the evidence does not show the deceased free from contributory neg-

ligence, and therefore the ruling of the district court was right.—Affirmed.

CLAUSSEN, C. J., and KINDIG, EVANS, and DONEGAN, JJ., concur.

STEVENS, J., dissents.