IN RE ESTATE OF BERTHA HELD.

GERTRUDE O'HARA, Claimant, Appellee, v. T. L. ASHFORD, Administrator, Appellant.

No. 45681.

NOVEMBER 18, 1941.

Dyer, Jordan & Dyer, for appellee.

Doran & Doran and F. Hollingsworth, for appellant.

BLISS, J.—In 1865, George Held began operating a meat market in a two-story frame building in the town of Boonsboro, now a part of the city of Boone, which business he maintained, excepting for a few years just following 1900, until about 1920. About 1925 or 1926, his son, Elmer Held, became the owner of the business and property, and he and his wife, Bertha, continued the operation of a grocery store and meat market at the same place, until the death of Elmer, in January 1939. His wife, Bertha Held, then became the owner of the ground, building, and business. Louis Nelson began working for Elmer, soon after he acquired the property, and continued to work for him until 1937 or 1938, when he bought a half interest in the business, stock and equipment. He had no interest in the real property. On the death of Elmer, he and the widow continued to operate the grocery and market as a copartnership in which each had an equal interest. The owners of the property had always lived in the second story of the building. Bertha Held continued to live there, and Nelson also had a room upstairs. He was a single man in his late twenties at that time. Elmer and Bertha had no children.

The proper decision of this case is bottomed almost entirely upon the facts, and it is, therefore, necessary to keep in mind the location of the stairway opening, into which the claimant stepped.

The building was on the southwest corner of the intersection of West Third and Fremont Streets. It was about 75 feet

long on Fremont Street and faced north on West Third Street. It was 20 feet wide, east and west. There was an east and west partition in the building dividing it into two parts, and making the south, or rear room, about 18 feet, north and south, by 20 feet, east and west. The larger or north portion of the building was used for the grocery store and meat market. The only door between the two rooms was at the extreme west end of the partition. When George Held owned the property, he had an outside entrance into the basement. There was a basement with a 7-foot ceiling under the entire building. Shortly after Elmer acquired the property, he put an inside entrance into the basement. This entrance and stairway into the basement was in the very southwest corner of the north room, or store proper, just north of and parallel with the partition, and 3 or 4 inches from it. The stairway opening was covered by a trap door in the floor, 5 feet long, east and west, and 30 inches wide. It was hinged at its west end, a few inches from the west wall of the building. The handle to raise it was at the northeast corner of the door. When the door was raised, the stairway opening was 23 inches wide. The head of the stairs was at the east end of the opening. It will be noted that this trap door, or the opening, was just north of and in front of the partition door. This partition door was 32 inches wide and 7 feet high, and the west edge of the door frame was 3 feet from the west wall of the building, so that the east end of the trap door came just about to the east side of the partition door frame. When the trap door was closed, it was a part of the floor used in passing through the door from one room to the other. When the trap door was open, as it occasionally was, anyone passing through the door simply stepped across the 23-inch opening, except Bertha Held, who was badly crippled with sciatic rheumatism, and blind in one eye, and who, as stated by Nelson always "took two hitches at it," by stepping down on the first step of the basement stairway, and then up on the other side.

In the basement was the furnace, and the motor, or cooling unit, of the refrigerator, and the cooled display counter, upstairs. The basement was also used as a storage place for surplus stock.

The smaller, south, back room had a rear door in the middle of the south wall of the building, with a window on each side of the door. There was also a window in the east, and in the west wall. In the southwest corner of the room was a table or bench used in making sausage. Over at the south end of the east wall was a gas stove and a sink. About the middle of the north, or partition, wall, and against it, was a desk. West of the desk, and between it and the partition door, was a vinegar barrel, raised about a foot so that its contents could be drawn off through a spigot at the bottom. About the center of the room was a dining room table. In this room most of the meals of Mrs. Held and Mr. Nelson, who was called Louie, were prepared and eaten.

Nelson, Mrs. Held, and a helper operated the store and market, except as additional help might be needed on Saturdays, and other busy days. Mrs. Held did most of the book work at the desk in the back room, and helped to wait on the customers.

As one went through the partition door into the north room, immediately to the right or east, 2 or 3 feet, was a large icebox or refrigerator. To the north of the refrigerator a few feet was the meat counter. The grocery stock was on each side and to the front of the room. To the left of the partition door, as you came into the north room, was a wooden door, without glass, opening onto Fremont Street. To the north of this door, and 10 feet from the trap door was a window 40 inches wide, and about 6 feet above the level of the ground. In closing the store and in opening it, Nelson or Mrs. Held left or entered by the back door at the south end of the building, in order to use the more direct and convenient, inclosed outside stairway to the second story.

The location and character of the windows is of no particular materiality since the accident occurred at 9 :00 o'clock at night. The artificial lighting in the north room, where the business was conducted, is also unimportant with the exception of one light near the west wall, above and just to the north of the trap door, with a cord to pull it on and off. The artificial lighting in the rear room is important. There were three electric lights, without question, and maybe a fourth one.

None of them had shades. They are spoken of as 60 watt and 60 candle power lights. Each operated on a separate switch. There was one in the southeast part of the room near the gas stove and sink, and away from the east wall. Another was over the sausage bench in the southwest part of the room. A third light was over and just back of the desk, and about 5, or 6, or 7 feet from the partition door. The dining room table was placed a short distance south of the desk. Mr. O'Hara testified to a fourth light over the table. The claimant also spoke of it but later in her testimony said there was no light there.

The claimant was a daughter of George Held and a full sister of Elmer. She was born and raised in Boone, and was thoroughly familiar with the store. After finishing a business course, she kept the books of account for her father, waited on the trade, and did other odd jobs about the store and market, for 7 years before her marriage about 1902 to a locomotive engineer in the employ of the Chicago & Northwestern Railway Company. They lived in Boone until 1914 when Mr. O'Hara was transferred to Clinton, Iowa, where they have since made their home. Mr. O'Hara was retired on a pension in July 1937. During all of their married life, they returned many times for visits at Boone, and this was particularly true after his retirement. During these visits, they stayed at and enjoyed the hospitality of the Held home in the store building. Their relations with Elmer and Bertha Held were the most cordial. Four times after the death of Elmer, in January 1939, the claimant, accompanied by her husband on some or all of these occasions, visited Bertha Held in her home. She stayed 10 days on her Memorial Day visit. She spent the first 2 weeks of August 1939 with Bertha. She testified that Bertha was not in good health. She was always one of the family when a guest in the Held home. She made herself useful about the place—waited on customers in the store—helped Bertha with her cooking and housework. The household victuals, customarily put in a refrigerator, were kept in the store refrigerator. The claimant many times had gone to this refrigerator to put in or take out milk, cream, butter, and other food for the table. She and her

husband had eaten many meals in the back room downstairs. She knew where every electric light, and its switch, was. She knew when the inside basement stairway and trap door were put in, more than 12 years before, and was familiar with the manner of its use. She had been in the basement many times. She knew that the switch which turned on the light in the basement was just above the stairway at the west side of the refrigerator. She was 63 years of age, weighed 142 pounds, in good health, and was, as she testified, "a poor specimen for a doctor." When she was in the Held home, she was not employed and received no compensation, other than the entertainment and hospitality of the home, and the opportunity to renew acquaintance with old Boone friends. When she was in the Held home in the first half of August, she learned that Louie wished to take his vacation, and she returned from Clinton on August 26, 1939, to be with Bertha in his absence, particularly so she would not be alone nights. Louie had arranged for a competent man to take his place, but he testified, as a witness for claimant, that he took her to the basement and explained to her the operation of the motor for the refrigeration system and showed her how to lubricate it. She denied this. But she testified that she knew of the practice, or "habit," as she called it, to open the trap door after the store was closed at night so that the better ventilation of the basement would prevent the air-cooled motor from heating.

Before she returned to Clinton, she arranged with an old friend of Bertha, Mrs. Benedict, for a surprise picnic lunch for Bertha at the Ledges State Park on Sunday, August 27th. It was after a late evening meal in the back room, after returning from the picnic, that the claimant stepped into the cellarway.

She received some injury to one heel bone, and a sacroiliac sprain. She had treatment at the hospital and the Held home, and the next Sunday, Louie and Mrs. Held took the claimant and Mr. O'Hara to Clinton in the Held automobile. A letter to the claimant from Mrs. Held dated September 15, 1939, introduced by claimant, complained of the extreme heat, dust and dry weather, and said: "Now how are (you) coming I hope

all right, am going to tell you I could use a cane and a crutch myself for several days, my right knee and hip have been something terrible cannot get upstairs or downstairs * * *. I think I am a little better today but not much, but think I'll come out of it all O. K. * * * Am hoping you are down stairs and walking now, take care of yourself. Lovingly, Bert." Loving solicitude is expressed in the letter but not a suggestion of any blame on her part for the injury, and there is nothing in the record that there had been any discussion between them of any such fault or liability.

Mrs. Held died 6 days after writing the letter, at the age of 68 years. She died intestate, and her property went, not to any relatives of her husband, but to numerous collateral heirs of hers. Counsel for appellee did not overlook this point in closing argument, and, as appellant claims, erroneously.

On February 6, 1940, the claimant filed claim for damages against the estate for $10,000. The administrator refused to allow it. It alleged negligence as follows:

"1. The deceased was negligent in failing to warn the claimant of the opening leading into said basement when the deceased knew, or in the exercise of ordinary care, should have known, that the door closing the same had negligently and carelessly been allowed to remain open.

"2. In failing to protect said opening into said basement by railing or other reasonable protective device or arrangement.

"3. In failing to have a light so located in the vicinity of said opening that the rays therefrom would disclose to the claimant that said opening was unprotected and open.

"4. In failing to close said door or in the exercise of reasonable care, know that the same was closed before requesting the claimant to pass through said door opening for the purpose of placing the said articles in the said refrigerator."

Defendant filed answer denying the allegations of negligence, alleging claimant's own negligence as the cause of any injury, also alleging voluntary assumption of risk and estoppel.

Claimant testified in her own behalf, and put on Nelson and her husband to testify in support of her claim. We will pass

over testimony respecting the injury and damages as unnecessary to a determination of the case. The death of his intestate having deprived him of the testimony of the only other person present that night, the administrator had no witnesses on the issue of negligence, or on what took place before and at the time of the accident. Defendant's motion for a directed verdict, which included as grounds the defenses alleged in his answer, was overruled.

The court submitted to the jury only grounds 2 and 3 of the negligence alleged. The jury returned a verdict of $2,250. Defendant's motions for new trial, and for judgment notwithstanding the verdict, were overruled. It is our judgment that defendant was entitled to a directed verdict in his favor.

On Sunday the store was open as usual until noon, and then closed for the remainder of the day. The claimant puttered around the store a little that morning and did some sweeping, and then busied herself selecting some articles of food from the store suitable for a picnic. Mrs. Benedict was bringing a chicken dinner. Louie put a dozen cans of beer in a bucket of ice, to take along. The claimant, Mrs. Held, and Louie in one car, and the Benedicts in their car, reached the Park about 1:00 o'clock, and after a pleasant time, returned to the store about 4:30 o'clock that afternoon. The Benedicts did not stop. The rest went in the back door, the bucket with six cans of beer was placed on the sausage bench, and some of the picnic food was put in the refrigerator. The claimant and Mrs. Held then went upstairs. The husband of the claimant was to arrive on a 7:20 p. m. train, and Louie called for the ladies with the Held car about 6:00 o'clock, and all went to meet the train, which came in about 7:30 p. m. They all returned to the store, with Mr. O'Hara. He testified that they came in the Fremont Street door, and the trap door was closed and they all walked across it into the back room. However, claimant and Louie said they all came in the back door. It was then about 8:00 o'clock. Claimant and Mrs. Held busied themselves preparing an evening meal. Louie and Mr. O'Hara each drank a can of beer. There is no claim that anyone at any time that afternoon or evening was under the influence of drink.

The claimant was the one who took the most steps in preparing the meal. She made several trips over the closed trap door to the refrigerator. The four of them seated themselves at the table—Mrs. Held was on the east side of the table, Louie on the north, claimant on the south, and O'Hara on the west side. The light near the gas stove was on for the preparation of the meal. Louie testified: "The desk light would have to be on that night to see to eat with. When we eat there we always have two lights burning. If we didn't our shadow would be in front of us, two lights are better. I have a definite recollection of the light being on. It was five feet east of the door." (Partition door.) He was unable to say whether the light over the sausage bench was on. He said if this light was on it would possibly reflect on the trap door. He said there was nothing to prevent the light over the desk and the light near the gas stove from reflecting on the door. He left the store to keep a date after the meal was over. He testified that he did not open the trap door that evening, and that he was positive it was not open while he was there. He testified: "When I left I told them to be sure and not forget to open the cellar door, when they got through." Claimant and her husband said they did not hear him say this, but claimant admits that she knew this was the practice of the store. The bucket with the beer was still on the sausage bench when Louie left.

Mr. O'Hara testified: "The light over the desk wasn't burning when we were eating. There was a light located right close over the table. The table was about flush with the desk. Only one light was burning when I was eating. * * * Mrs. O'Hara fell into the stairs about nine o'clock. * * * She was carrying butter and cream when she fell. I saw her pick the articles up and start with them. I was sitting on the west side. I was about eight or ten feet from the door. * * * The light over the table was on when we got there. I think the light in the back end was the only light on when we went in. The room was all lighted up but we couldn't see the light as we came in the west door. I know the basement door was closed because we walked over it. * * * I didn't open that stair door. I don't know who opened it. The door was closed when we went in there, be-

cause we went over it. Don't know whether it was closed or not when we were eating supper."

Respecting the conditions and circumstances that night, the claimant testified:

"In getting supper I passed from the back room to the main store room. We always had a lot of running back and forth to get grub. I got cream and butter out of the refrigerator in the main room and passed over the cellar door, which was closed at the time. I didn't open the cellar door that night. I don't know whether Louie opened it or not. Mr. O'Hara didn't. I didn't see Louie or Mrs. Held open it. * * * After the dishes were washed and put away the cream and butter remained on the table. I picked up the butter and cream and started to put it in the icebox. That was when I stepped into the stairway. * * * There was no light in the basement. I didn't know the floor door was open. The light over the sausage table was not burning. The light near the dining room table was burning. I am not positive the light over the desk was burning. I imagine the light over the desk was burning because we were ready to go upstairs, and that was the last, around the last thing we had to do. I do not know who turned off that light. I don't recall that I did. I can't swear whether the light over the desk was going when I started to put the cream and butter in the refrigerator. The desk light is five or six feet from the cellar door. It hangs low enough so we could work. * * * I knew at that time where the light switch was on the west end of the refrigerator. * * * When I was here in 1928 my brother (Elmer) probably took me down stairs to show me the furnace. I am entirely familiar with the building from the second floor clear through to the basement. I was also familiar with the habits of the building. I was familiar with where the lights were located. * * * We went in the south door that night when we came from the depot. We lit the lights after we got there. When we went into the building then there might have been a little light. I don't think so, because it wasn't dark when we went after them. I heard my husband tell us about a light that was lighted over the table when we came into the building, it could have been lighted but I don't know anything about it. I don't recall it. If there was a light

I don't know if it was lighted. We did have the light over by our stove where we done our cooking. There is no light over the table, the light is over by the desk, and that is what we would eat by. There was no light directly over the table. It pulled over to the desk and then we had the light we cooked by over in the corner. I don't know if there were any lights inside the building when we came in that night. The light that is over by the ice box could have been on but I don't recall it. I mean by the window, the west wall. I think they dimmed that and yet it might be a bright light, I don't remember. I don't recall but the light by the ice box on the west wall could have been on. I remember going from the south room to the ice box several times. The light on the west was the one we used to see around in the ice box. I could pull that light when I went to the ice box. There is a string to pull it on. I recall going back and forth to the north room several times that evening getting stuff for supper. The only light we could see what we were doing with walking along the north side of the ice box was the light on the west wall. I remember pulling that light on one trip. I pulled it off when I came back from the ice box. If I were out there three or four times, I probably pulled it on and off. Coming out of the south room and going to the ice box, that is the handiest light I could get hold of. I knew the basement door was there since 1928. For the past nine or ten years I have been a frequent caller at my brother and sister-in-law's home. We had railway transportation and we could run back and forth whenever we felt like it. I worked in the store and waited on customers a number of times while my brother was living. * * * In the eight months following his death this was my fourth trip to Boone. * * * I have been in that basement any number of times since my brother operated the store. * * * It was about eight o'clock when we got back to the store. It was getting dark. I know there were lights on when we got inside the building. * * * I knew there was an air cooled ice machine in the basement, and I knew the usual custom was, the last thing at night to leave the door open that leads up into the store. I have heard Louie tell about the ice machine getting hot."

Speaking of the light near the icebox, she said:

"The light was about six feet from the west end of the cellar door. The west end of the cellar door would be a foot or so west of the west edge of the partition door. * * * It was our habit to pull that light on and off as we went in and out. It gave light, to get around with. I only used it to go to the ice box when there was no light in the front shop. After we closed that is the only light we used. I have an idea that we turned the one light off. Q. You didn't mean to leave the impression there wasn't any light on? A. Yes. * * * The light by the sink was on when I started through the doorway with the cream and butter. * * * The light on the west wall was not burning at the time I fell. The store was dark."

We have set out the material testimony quite fully and in the words of the witnesses.

I. There is no allegation in the claimant's statement of her cause of action, nor in its submission to the jury, that Mrs. Held opened the trap door on that Sunday evening. The first charge of negligence against Mrs. Held, which the court submitted to the jury was: "In failing to protect said opening into said basement by railing or other reasonable protective device or arrangement."

There is no claim made that there was any negligence in placing or maintaining the basement stairway and trap door in the place where they were. So far as the record shows, they may have been located in the most available and practicable place in the building. They were in a place where the patrons' of the store would not ordinarily be. The only definite protection suggested was a railing. A railing on either side of the trap door or opening would have barricaded any passage through the door, or seriously impeded anyone attempting to go to or from either room. It would have defeated the purpose of having the door. Such a railing would likely interfere with the convenient and full use of the basement stairway. This interference with the passageway through the door, and use of the stairway, would be present at all times whether the trap door was open or closed. To require any such protection would be an unreasonable restriction of the use of the building. When the trap door was closed, the passageway was just as safe as any other part of the floor. There is nothing in the record to

show how often, or for what length of time, the trap door would be open. The use of the stairway would reasonably appear to be only occasional. No other protective device or arrangement is suggested. The absence of a railing on this occasion was not, in our opinion, negligent. The purpose of a barrier is ordinarily to warn of danger. There was no need to warn the claimant. She had full knowledge of all the attending facts and circumstances. She had passed through that door and over that basement entrance, both open and closed, a great many times in the more than 12 years since her brother constructed the inside basement entrance. She knew its condition. She knew it had no railing. She knew the trap door would be open at times. She knew the dangers and she was willing to, and did, assume such dangers as there were. There was no allegation of negligence submitted that Mrs. Held opened the trap door and failed to warn the claimant. There was no issue submitted that the claimant was the victim of any entrapment. Just three persons were there after Louie left. Mrs. Held is not here to tell us her version of what took place, but the claimant and her husband were there at all times and they have not said that Mrs. Held opened the trap door. They testified that they did not see her open it. They gave no information on which the jury could, or this court can, reasonably say that she did open the trap door. There is nothing more than the merest guess or conjecture that Mrs. Held had anything to do with the opening of the door. We have many times said that verdicts cannot and must not be based on guesses or conjectures. Many cases could be cited on this self-evident rule of law. We will content ourselves with the words of the court as expressed by Justice Gaynor in Sanderson v. Chicago, M. & St. P. Ry. Co., 167 Iowa 90, 101, 149 N. W. 188, 192: "Before a fact can be said to be proven, even prima facie, there must be some substantive evidence of the existence of the fact. A jury ought not to be turned loose in the field of speculation, and guess as to what the facts are * * *." However, that issue is not in the case. The only negligence claimed in the allegation submitted is in the failure to properly protect the opening. This allegation was not sustained and should not have been submitted to the jury.

II. The only other ground of negligence on the part of Mrs. Held which was submitted was: ''In failing to have a light so located in the vicinity of said opening that the rays therefrom would disclose to the claimant that said opening was unprotected and open.''

The claimant needed no light to be located so as to disclose to her that the opening was unprotected. For over 12 years she knew there was no protection about the basement entrance. The record shows without reasonable question that lights were located where their rays would disclose to anyone whether this trap door was open. The claimant's testimony establishes conclusively that there was a light in the same corner of the room where the trap door was. She locates it thus: ''The light was about six feet from the west end of the cellar door. The west end of the cellar door would be a foot or so west of the west edge of the partition door. * * * It was our habit to pull that light on and off as we went in and out. It gave light to get around with. * * * I don't recall but the light by the ice box on the west wall could have been on. * * * The light on the west was the one we use to see around in the ice box. I could pull that light when I went to the ice box. There is a string to pull it on. * * * The only light we could see what we were doing with when walking along the north side of the ice box was the light on the west wall. I remember pulling that light on one trip. I pulled it off when I came back from the ice box. If I were out there three or four times, I probably pulled it on and off. Coming out of the south room and going to the ice box, that is the handiest light I could get a hold of. * * * It gave light to get around with.''

Direct testimony is not needed to establish that this light was so located that its rays would disclose the opening. It was above and 6 feet from the trap door. It cast rays of light over beyond the trap door to the north side of the icebox. This court will take judicial notice that its rays would reach and disclose that the trap door was open. There was another light in the basement which would also disclose the opening. In the south room there were, certainly, three unshaded 60 candle power lights, and testimony that there was a fourth one. All in a room 18 by 20 feet. One was 5 or 6 feet from the par-

tition door. A light over the dining room table would not be over 8 or 10 feet away. The one over the sausage table around 12 or 15 feet away, and the one by the sink, about 18 feet from the diagonal corner. Was Mrs. Held reasonably required to have more lights to disclose this trap door? We are certain that she was not so required.

From the contradictory and uncertain testimony of the claimant, there could be no fair and reasonable finding respecting what, if any, lights were on or off, if it can be said that such a finding is called for by this allegation of negligence.

Amply sufficient facilities were furnished by Mrs. Held to give all the light needed to disclose to any person, who would look, whether the trap door was open. The claimant was there actively engaged in getting a meal of which both she and her husband would, and did, partake. It is her apparent contention that she was in Boone to help Mrs. Held and to save her steps. That evening she was more active in the preparation of the meal than Mrs. Held. She knew the habits of the home and the store, as she said. She knew where the lights and switches were. She had two eyes, and Mrs. Held, but one. It is our considered judgment that Mrs. Held, under this record, had no legal duty or responsibility to follow the claimant about turning lights off and on for her. The claimant concedes that the light on the west wall above the trap door "gave light to get around with." She was the one who was pulling it on and off. There is no consistency in her testimony as to whether it was lighted or unlighted when she fell. If it was unlighted, there is not a scintilla of either evidence, or of inference that Mrs. Held was the cause of it. No one testified that she pulled it off. The testimony and the reasonable inference is that the claimant did so. She testified that when she pulled it on, she probably pulled it off. She also testified that at the time she fell "I have an idea we had turned the one light off. The store was dark." In the south room, the evidence definitely shows that the light near the sink was on to enable them to do the cooking and dishwashing. Two lights or more were on while they were eating. The claimant testified that "we lit the lights after we got there," and there is no testimony that Mrs. Held turned any of them off. The claimant said: "The light by the sink was on when I

started through the doorway with the cream and butter.'' There is no testimony that the light by the desk and table was not on. It is our conclusion that the claimant failed to establish this second ground of negligence, and that it should not have been submitted to the jury.

III. The appellant strongly urges that the sole proximate cause of the claimant's injury was her own negligence, and that if it was not the sole cause, it was a contributing cause. It was the burden of the claimant to show her freedom from any negligence contributing in any degree to her injury. Appellant insists that claimant failed to carry this burden, as a matter of law. Appellee contends that the issue of contributory negligence is almost without exception for the jury to determine. It is true, as we have so often said, that questions of fact are to be answered by the jury, if reasonable minds might reasonably differ on the answer. But negligence of a plaintiff is no different in character or result than the negligence of a defendant. We have many times sustained directed verdicts on both issues. A few of the cases in which this has been done on the question of contributory negligence are Lindloff v. Duecker, 217 Iowa 326, 251 N. W. 698; Parrack v. McGaffey, 217 Iowa 368, 251 N. W. 871; Nyswander v. Gonser, 218 Iowa 136, 253 N. W. 829; Zuck v. Larson, 222 Iowa 842, 270 N. W. 384; Reynolds v. Aller, 226 Iowa 642, 284 N. W. 825; Cumming v. Dosland, 227 Iowa 470, 288 N. W. 647; Denny v. Augustine, 223 Iowa 1202, 275 N. W. 117; Sodemann v. Ry., 215 Iowa 827, 244 N. W. 865; Fortman v. McBride, 220 Iowa 1003, 1009, 263 N. W. 345; Hedberg v. Lester, 222 Iowa 1025, 270 N. W. 447. In view of the fact that this case may be tried again, we express no opinion as to whether the issue of contributory negligence was one of law or of fact.

IV. Appellant insists that the court erred in telling the jury that claimant was an invitee of Mrs. Held on her premises. We will not pass on that question. It involves communication and a transaction with the defendant's intestate. Evidence apparently in the record this time may not be in if the case should be retried. Furthermore, the important question of the liability of a host to one who is receiving the hospitality of his home is suggested but not discussed. Before passing upon the question, we should have the benefit of a full presentation.

V.   In view of our decision, it is needless to pass upon the assignment of error respecting appellee's closing argument.

We have given to the evidence the interpretation most favorable to the claim of the appellee.

The judgment is reversed.—Reversed.

MILLER, C. J., and WENNERSTRUM, SAGER, OLIVER, GARFIELD, HALE, and STIGER, JJ., concur.