R. L. RICHARDS, Appellant, v. MELVIN BEGENSTOS et al., Appellees.

No. 46763.

DECEMBER 11, 1945.

REHEARING DENIED MARCH 13, 1946.

Baldrige & Bailey, of Washington, and D. C. Nolan, of Iowa City, for appellant.

S. W. Livingstone, of Washington, and Hallagan & Cless, of Des Moines, for appellees.

BLISS, J.—The collision on which the action is based was in the town of Ainsworth, at about 9 a. m. on January 18, 1944, on Iowa Highway No. 92. The plaintiff, a man seventy-six years old, lived in the town of Cotter in Louisa county, but was then and had been since 1938 employed as a bookkeeper by a livestock firm in the city of Washington, in Washington county. Each day while so employed he had driven to his work in his automobile from Cotter to Washington in the morning over Highway 92, and in the evening he returned home in the same manner over the same route. The distance was twelve miles and he passed through Ainsworth en route.

Begenstos lived at Waterloo and was employed by his codefendant as a tobacco salesman. In covering his territory he drove a panel truck owned by his employer.

The petition of plaintiff alleged that Begenstos was negligent in (1) failing to keep a proper lookout (2) failing to drive his automobile at a careful and reasonable rate of speed under the circumstances (3) failing to exercise ordinary care to avoid colliding with plaintiff's car when he saw he was in a position where he would be injured unless such care was used (4) failing to yield the right of way to plaintiff (5) driving at a high and excessive rate of speed of more than twenty-five miles an hour, in violation of the speed laws of the state as applied to the zone and district in which the collision occurred. The answer of defendants denied these allegations.

The jury could have found the facts hereinafter stated established by the evidence. A district engineer of the State Highway Commission who had supervision over Highway 92 in that locality testified to the course of the highway, the loca-

tion of material places, and to elevations and distances. He testified from personal knowledge, aided largely by an engineer's blueprint plat and profile used in the construction of the highway, so that these matters are put beyond reasonable dispute. The highway extends through the town in a general east-and-west direction, veering slightly from northwest to southeast. The paved slab of the road is eighteen feet wide. In constructing the highway the engineer surveyed it in stations one hundred feet apart. These stations with their numbers were marked on the pavement as it was laid. They increase progressively in numerical value from west to east.

The defendants' truck was proceeding from the west to the east. Plaintiff was driving from the east to the west. As you enter the town from the west the first street to intersect the highway from the north is Third Street, at approximately station 1372—90 feet or 1372.90. We will refer to the stations by decimal. Just east of Third Street, at station 1373.75 and facing the west, was a 25-miles-an-hour speed-limit sign. The elevation at Third Street is 674.3 feet above sea level. Continuing east for 460 feet to station 1377.50, which has an elevation of 670.6 feet, there is a downgrade with a drop of 3.7 feet. Proceeding east 300 feet to station 1380.50 the rise in the grade is 7.22 feet. Station 1380.50, with an elevation of 677.88 feet, is the highest point on the highway in the town of Ainsworth. The witness in his testimony gave this elevation as 675.8, but it was apparently an inadvertence as the profile from which he was testifying gives the figure as 677.88. It was over the top of this hill that defendants' truck passed eastward just prior to the collision. Proceeding east from station 1380.50, the top of the hill, for 600 feet to station 1386.50, which has an elevation of 661.51 feet, there is a sharp downgrade with a drop of 16.37 feet. Going from station 1386.50 for 115 feet to station 1387.65, which is the west end of a 60-foot bridge over Long Creek, the highway is almost level, since the elevation at station 1387.65 is 661.51 feet. Station 1387.65 marks the corporate limits of the town. In order to locate the Hazelett Oil Station, the Shamrock Inn, and other material points it is necessary to go back to the top of the hill, station 1380.50. About 150 feet east of this station First Street opens into the

highway but does not extend beyond. Its east line was at station 1382.54. About 25 feet east of the east line of the street, at station 1382.84, was the east 25-miles-an-hour speed-limit sign. It stood on the north shoulder of No. 92, about 10 feet from the paving, and faced east. The speed zone was about 900 feet long. As noted above, the highest point on the highway in the locality of the collision was 677.88 feet. The grade approaching that point from the east and west was not pronounced. This was true for about 100 feet on each side of it. The top of the hill was gently rounded for about 200 feet or slightly more. A layman might have difficulty in ascertaining just where the highest elevation of the hill was and a surveyor would need his instruments to locate it. We mention this as it bears upon testimony of the plaintiff and others as to locations and distances. Then as the road proceeds east it has what the engineer spoke of as a vertical curve, that is, the grade descends more sharply. This descent begins a little east of station 1381.50. The steepest part of the hill is going east between stations 1382.50 and 1384.50, where the grade is 3.82 per cent. The Hazelett Oil Station, at which the plaintiff intended to stop for service that morning, is on the south side of Highway 92. He had patronized it at other times. It was operated by Hugh Hazelett and his brother. The testimony is somewhat contradictory as to the location of the station with respect to First Street. The engineer and Hugh Hazelett testified that part of the property might be on what would have been First Street had it been extended across the highway. However, Hazelett also testified that it was about 20 feet west of First Street. The dimensions of the station are not shown. Neither is the width of First Street. If it is 60 feet wide its west line would be at approximately station 1382. The home of the father of the Hazelett boys immediately adjoined the oil station on the west and farther west and about 200 feet from the oil station is the Standard Oil Station.

East of the Hazelett Oil Station and on the south side of the highway is the Shamrock Inn or Café. The west side of it was about 50 or 60 feet east of the oil station. The dimensions of the inn do not appear but it had a lean-to kitchen at

the east end of the building. The inn and the Hazelett Oil Station were both about 30 feet south of the pavement. The pavement had the usual sloping curb to facilitate the flow of water. This curbing and the south shoulder of the pavement and all of the space between the paving and the inn and the oil station were covered with crushed rock. It extended from a point estimated as both 25 and 50 feet south of the inn to west of the oil station, and with the pavement made a hard-surfaced way approximately 48 feet wide for that entire distance.

We insert herein a photostat of plaintiff's Exhibit C, which is a photograph of Highway No. 92 looking east along it past the Hazelett Oil Station on the right, the entrance of First Street on the left, the Shamrock Inn on the right.

On east at the foot of the hill is the bridge over Long Creek, and beyond the highway curves up to the left eastward over a long hill which reaches an elevation at station 1406 of 722 feet, 60.5 feet higher than the elevation at the bridge. The Hazelett Oil Station is not shown on the right in the picture

but the D-X gasoline sign is shown on the pole in front of it at the corner of the property. Just east of First Street on the north shoulder of Highway 92 is the speed-limit sign which marked the east limit of the 25-miles-an-hour zone. This sign was at station 1382.84. The collision of the two cars was at station 1383, just 16 feet farther east than the sign and across the pavement on the edge of the crushed-rock driveway, about even with the east side of the kitchen.

The plaintiff left his home at Cotter about 8 o'clock on the morning of January 18, 1944. It had rained or sleeted during the night and the pavements were covered with a skim of ice on which a white frost had formed. The pavement was very slippery. He testified:

"As I approached the town of Ainsworth I came down the hill east of the creek rather slow, because that is a treacherous hill and when I got to the bridge I was going from 10 to 15 miles an hour. As I went on west of the bridge I did not accelerate or change my speed. The condition of the pavement was such that it wasn't safe for fast driving, the pavement was slippery and for that reason I was driving slow. I intended to turn into the Hazelett Oil Station * * * After I crossed the bridge, maybe 200 or 250 feet I decided to cross the pavement to get over on that rock. * * * The reason I intended to get on the rock there at that place was because I considered it safer to cross there than to go further up; the hill was steeper right in front of the station."

He said he wished to get on the rock because the pavement was so slippery that it was difficult to make a short turn on it. It was his intention to make what he called a "long turn" to get to the driveway just below the inn. He was about 150 feet east of the east end of the rock drive when he decided to begin the long turn. Just how he intended to execute such a turn for 150 feet on an 18-foot pavement is not very clear. He said he could see west up the pavement perhaps 600 feet from the place where he began to turn. This would extend his vision beyond the high point of the hill. There was no vehicle in sight either to the east or west. He thought

he had time to reach the driveway before meeting a vehicle from the west. On cross-examination he testified:

"I stated on direct examination that I was about 150 feet from this point of gravel when I started to make the turn and had gone about 100 feet of that 150 feet when I saw the cigarette truck. I was traveling southwest; the front part of my car was over the black mark and possibly the hind wheels were not. Both front wheels were to the south of the center of the black line. I think the left hind wheel was over the black line and the right rear one was north of the black line. After I had started my turn I had traveled about 100 feet [when] I saw the truck. I had traveled approximately 100 feet in getting from the north side of the pavement to where my front wheels were to the south of the center line and one wheel north of the center line. I still had about 50 feet to go to that part of the drive there in front of the Shamrock Inn. * * * I was going about 10 miles an hour and that was the speed of my car when I saw the cigarette truck starting down the hill. I traveled almost that 50 feet while the cigarette truck was coming down the hill. * * * My left window was down about 4 inches. * * * The cigarette truck was about 150 to 200 feet from me when I first saw it. He was just coming up over the top of the hill. There was no other car coming from the west. My car steered well."

Asked the speed of the truck, he answered: "I would say 30 or 35 miles an hour." In testifying of the place of collision, he said: "Well, I believe the front part of the car was pretty well over the pavement; the left wheel was over and the right one was on the edge. My car was partly over on the graveled shoulder." Asked if he was conscious of his car being shoved back as a result of the impact, he replied: "I suppose it was shoved back." He was knocked unconscious and recalled nothing of the occurrence until several days later in the hospital.

Hugh Hazelett testified that he was getting ready to shave near an east window in the station when he saw plaintiff's car just turning from the north side of the pavement to the south with the front end of his car about two feet south of the black center line, about 20 feet east of the east side of

the Shamrock Inn, and traveling about ten to fifteen miles an hour. He testified:

"I could not see whether he was headed in a sharply southwesterly direction or gradually pulling over, because when I saw him I just didn't know whether he was coming in to the Shamrock Café or my place. I think he was headed for about the point where a car driving into Shamrock Inn and into my station [would enter]. There is a place there of several 100 feet that a fellow can drive his car from the highway into the Shamrock Café or into our station. That driveway commences off down there about 50 feet or so east from the Shamrock Café, and from there on east it is just a common country shoulder * * *."

While Hazelett was watching the plaintiff he looked out of his north window and saw the tobacco truck going east, traveling thirty-five to forty miles an hour. He testified:

"The pavement had a heavy coating of frost on that morning. When I saw the truck going by the station its wheels were sliding; I just supposed he was going to pull in at the Shamrock to see if they wanted tobacco; I did not realize he was putting on his brakes not to hit R. L. Richards' car * * * I did not see the two vehicles come together but I heard the impact. I went out to the scene of the accident which occurred about 110 feet east of the station. They came together within 5 or 10 feet east of the northeast corner of the Shamrock Café. * * * I think that about all of the Richards car that was on the pavement after the collision were the back two wheels, the balance of the car was off the pavement and it was facing in a southwest direction. The back of the Liggett & Myers Tobacco Company truck after the collision was off the pavement on the south side and it was facing in the southeast direction. The two cars were locked together. * * * I could see where the truck tires burned the frost off the pavement. I first noticed them west of my station and they extended on down to the place where the truck stopped. I would say they extended 200 feet anyhow from the point where I first noticed them start down to the point of the collision. * * *

Those skid marks or wheel marks were all south of the center of the highway. They angled to the south, he had one brake holding a little more than the other, I believe, so that as they approached the place where the impact took place the south marks ran into the gravel onto the shoulder of the road, the right wheel marks, they would be the wheels on the south on the cigarette truck. I would say that the truck left the pavement about 50 feet west of where the two wheels came together. * * * The higher point of the pavement, the brow of the pavement, was a little west of our station. I would say that the skid marks started about 15 feet from east of the high point of the hill.''

Another witness had delivered meat to the Shamrock Inn and was sitting in a booth looking northwest and saw the tobacco truck about in front of the Hazelett filling station. He judged its speed as ''35 to 40 miles an hour, rather to the 40,'' and continuing for some distance at that rate of speed. He did not see the collision, as the truck passed out of his range of vision. He went at once to the collision and described the position of the cars about as Hazelett did. The left front wheel of the Richards car was south of the pavement, the right-hand hind wheel was about at the black line and the left hind wheel was south of the black line. He judged the truck skid marks to be around 150 feet in length. The front end of the truck was about half off and half on the pavement. He testified:

''A car can leave the pavement anywhere from a point 25 feet east of the Shamrock Café and drive onto that area all the way up to the Hazelett Oil Station. That is all maintained, crushed gravel or rock.''

Another witness took the plaintiff to the hospital at Washington over the same route that Begenstos had driven the tobacco truck. He testified that the pavement all the way to Washington was still frosty. The deputy sheriff who drove to the scene of the accident from Washington about thirty minutes after the collision also testified to the frosty and icy condition of the road. His recollection of the position of the cars after the collision was that the truck was in front of the

Richards car, with both right wheels south of the pavement, and the Richards car was headed southwest but all on the pavement, with both cars north and slightly west of the east line of the Shamrock Inn. He testified that station number 1383 was just ahead of the truck. Both cars were badly damaged, as shown by pictures. The repair bill on plaintiff's car was $346.11, and the tobacco company pleaded that the repairs on the truck were of the value of $358.87.

In ruling upon the motion to direct the trial court conceded that the driver of the defendants' car was negligent, and based the ruling solely on the ground that plaintiff was negligent and that his negligence contributed to his injury as a matter of law. Under the record before us there can be little question of the truck driver's negligence. The testimony of the witnesses who saw the truck for over a hundred feet before the collision, the skid marks, the momentum with which it collided, and the damage to each car, all speak very convincingly of a speed in excess of the limit of twenty-five miles an hour. Two witnesses estimate the speed at forty miles an hour, and the physical facts tend to corroborate them. They testify that they observed the wheels to be set and sliding instead of revolving, and this fact appeared to increase rather than lessen the speed. Begenstos knew the icy, slippery condition of the road, and the hilly condition which increased the danger of that condition. He knew that these conditions and the speed at which he was traveling would greatly lessen and likely deprive him of any control over the movements of the truck. He knew he could not see the traffic, or the use being made of the highway, over the hill until he reached its top. He apparently was not a stranger to the highway as Hazelett, from a glance through the north window, recognized the vehicle as the "Chesterfield truck" and thought it was turning in on the stone drive to the Shamrock in the business of the tobacco company. Begenstos saw the plaintiff as soon as he reached the top of the hill and must have observed that he was attempting to turn on to the crushed stone driveway at its lower end, about 300 feet distant. He must have seen him from the top of the hill, because there was testimony that he set the brakes of the truck about 15 feet east of the top, and it

took time for his foot to react to the message from the brain. The road conditions were such that his speed should have been much less than the statutory limit instead of much greater. Speed limits, signals, and other traffic regulations, whether statutory or otherwise, call for the minimum of care and not the maximum. The circumstances and conditions may be such that the reasonable and ordinary care of the prudent person is not satisfied or fulfilled by mere compliance with the regulations but requires the exercise of more or other care. Whatever precautions ordinary and reasonable care and prudence require for the proper protection of others must be taken even though not exacted by statutory provisions. The care which the law requires must ordinarily be measured and proportioned to the dangers reasonably to be guarded against. A motorist should not operate his vehicle up to the speed limit of the statute, ordinance, or regulation if the circumstances are such that reasonable and ordinary care and prudence require a lesser speed. Glanville v. Chicago, R. I. & P. R. Co., 196 Iowa 456, 462, 193 N. W. 548; Langham v. Chicago, R. I. & P. R. Co., 197 Iowa 1118, 1124, 1125, 198 N. W. 525; Anderson v. United States Ry. Admn., 197 Iowa 1, 3–5, 196 N. W. 584; Wiese v. Chicago G. W. R. Co., 182 Iowa 508, 511, 512, 166 N. W. 66; Hart v. C., R. I. & P. R. Co., 56 Iowa 166, 170, 7 N. W. 9, 9 N. W. 116, 41 Am. Rep. 93; 4 Shearman and Redfield on Negligence, Revised Ed., 1941, section 697; 2 Blashfield, Cyclopedia of Automobile Law and Practice, Perm. Ed., section 1252; 3 Berry, Law of Automobiles, Seventh Ed., section 3.152.

But to entitle the plaintiff to recover damages in this case it is not enough that he establish the negligence of the truck driver, even though that negligence be extreme. He must also establish his own freedom from negligence which contributed in any manner or degree to his injury. He and Begenstos had equal rights of travel along the highway. Each owed the other the duty of reasonable and ordinary care. Each could assume that the other would comply with rules of the road and traffic regulations as determined by statute, the common law, and the dictates of reasonable and ordinary care as commonly exercised by the reasonably prudent man under the same or similar circumstances. That is, he could assume and rely upon such com-

pliance until he knew, or, in the exercise of reasonable care, should have known otherwise. Rhinehart v. Shambaugh, 230 Iowa 788, 791, 298 N. W. 876; Banghart v. Meredith, 229 Iowa 608, 611, 294 N. W. 918. As said by Chief Justice Hamilton, in Rogers v. Jefferson, 224 Iowa 324, 329, 275 N. W. 874, 878:

"It must, of course, be granted that one may not go upon a busy public highway and shut his eyes to danger and bask in the dim rays of hope given forth by this more or less uncertain luminary of assumption. It must be kept in mind that this safety zone, created by assumption only, ceases to protect one when it becomes apparent, or in the exercise of ordinary care and caution should become apparent, that the law is not going to be obeyed."

The plaintiff knew as he saw the truck come past the Hazelett Oil Station 200 feet away that he was exceeding the speed limit, and also the speed which ordinary care demanded, considering the vertical curve of the hill and the slick, icy condition of the pavement. He had been driving automobiles since 1913. He had driven over this highway through Ainsworth every day of his work for six years. He knew the slippery, dangerous condition of the pavement that morning, and that the lack of traction between the tires of each vehicle and the icy surface of the pavement would impede his progress up the hill and accelerate the truck's progress down the hill. When he first saw the truck it was 150 or 200 feet away and was traveling thirty or thirty-five miles an hour according to his own estimates. Giving him the benefit of the premises most favorable to him, the truck was 200 feet from him and had a speed rate of thirty miles per hour. He was 50 feet from his goal and traveling about ten miles an hour, according to his judgment. While he was traveling 50 feet of the intervening 200 feet the truck would travel three times 50 feet, or 150 feet of that distance, and the inevitable answer would be the collision of the vehicles if neither changed its course.

There was no other vehicle on the highway when plaintiff began his "long turn," and because of that he was not then required to comply with section 5025.04 of the 1939 Code, which reads thus:

"When signal required. No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a clearly audible signal by sounding the horn if any pedestrian may be affected by such movement or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement."

But as soon as the truck appeared at the top of the hill another vehicle was affected and it was incumbent on him then to comply with the statute by proper signal if he still intended to turn onto the rock driveway. He never gave the statutory signal. But he continued to travel southwesterly somewhat astride the black center line. The driver of the truck could not be certain what the plaintiff was going to do. Throughout most of the last 50 feet the plaintiff traveled he was at all times in a position to turn back into the right lane. He said his car steered well. It was no more difficult for him to drive his car northwesterly than it was to drive it southwesterly. The driving conditions were the same. He could have stopped his car almost instantly. But had the truck driver turned to his left as plaintiff turned to his right and a collision had occurred the former would have been negligent.

Notwithstanding the provision of section 5024.01 requiring the operator of a motor vehicle, in cities and towns, to at all times travel on the right-hand side of the center of the street, he had a right to make such reasonable use of the left side of the street as might be necessary to turn into the crushed-stone driveway at the place he attempted to. It had been constructed and used by patrons of the Hazelett Oil Station and of the inn. But in doing so he was required to comply with said section 5025.04.

He had a safe course to pursue which would have fully protected him, but he chose not to take it and voluntarily placed himself in a place of obvious danger, which his experience and knowledge of existing conditions should have told him would very probably and almost certainly result in injury to all concerned. Parrack v. McGaffey, 217 Iowa 368, 370, 371, 251 N. W. 871; Lang v. Kollasch, 218 Iowa 391, 394, 395, 255

N. W. 493; Fortman v. McBride, 220 Iowa 1003, 1007–1010, 263 N. W. 345; Hittle v. Jones, 217 Iowa 598, 603, 604, 250 N. W. 689; Lindloff v. Duecker, 217 Iowa 326, 334, 335, 251 N. W. 698; Nyswander v. Gonser, 218 Iowa 136, 144, 253 N. W. 829. In an analogous case, Davis v. Hoskinson, 228 Iowa 193, 204, 290 N. W. 497, 502, this court said:

"She took a chance which a reasonably prudent person would not have taken. As this court has said, one cannot * * * indulge in nice calculations whether he may barely escape injury, nor may he take reckless chances and be free from contributory negligence."

See, also, Burnett v. Chicago, M. & St. P. Ry. Co., 172 Iowa 704, 712, 154 N. W. 919, 922. And, as said in Sohl v. Chicago, R. I. & P. Ry. Co., 183 Iowa 616, 622, 167 N. W. 529, 531: "The law will not permit of such experiments with danger, at another's risk."

We said in Toney v. Interstate Power Co., 180 Iowa 1362, 1378, 163 N. W. 394, 400, and we have many times repeated the principle expressed therein, that "* * * the question of contributory negligence is peculiarly one of fact and not of law, save only in those exceptional cases where the plaintiff's want of reasonable care is so manifest and flagrant as to at once convince all fair and candid minds that he did not exercise the caution for his own safety which marks the conduct of ordinarily prudent men." This is one of those exceptional cases.

While the humanitarian doctrine of "last clear chance" was pleaded it was not presented on this appeal.

The judgment is affirmed.—Affirmed.

MILLER, C. J., and HALE, OLIVER, WENNERSTRUM, SMITH, MANTZ, and MULRONEY, JJ., concur.

GARFIELD, J., dissents.